## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GREGGE S. BEIERMANN, | ) | CASE NO. 4:04CV3255 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| vs. | ) | AND ORDER |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the

Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42

U.S.C. §§ 401-433, and supplemental security income ("SSI") benefits under Title XVI of

the Act, 42 U.S.C. §§ 1381-1383.  The Court has carefully considered the record and the

parties' briefs (Filing Nos. 16, 19, 22).

### PROCEDURAL BACKGROUND

The Plaintiff, Gregge S. Beiermann, filed his initial applications for Disability and SSI

benefits on or about September 10, 2001.  (Tr. 65-67, 455-62.)  The claims were denied

initially (Tr. 35-36, 39-42, 465-68) and on reconsideration (Tr. 45-49, 469-74).   An

administrative hearing was held before  Administrative Law Judge ("ALJ") Jan E. Dutton

on July 17, 2003.  (Tr. 488-527.)  On July 25, 2003 the ALJ issued a decision finding that

Beiermann was not "disabled" within the meaning of the Act and therefore is not eligible

for either disability or SSI benefits.  (Tr. 18-30.)  On May 28, 2004, after considering

additional evidence (Tr. 475-87), the Appeals Council denied Beiermann's request for

review.  (Tr. 9-12.)  Beiermann now seeks judicial review of the ALJ's determination as the

final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Beiermann claims that the ALJ's decision was incorrect because the ALJ failed to: 1) consider all of Beiermann's impairments; 2) pose a proper hypothetical question; 3) properly determine Beiermann's residual functional capacity; and 4) find Beiermann's testimony credible.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Beiermann is now twenty-eight years old.  (Tr. 65.)  He has a high-school education. (Tr. 87.)  Beiermann's occupational experience includes work as a school janitor, sporting goods salesperson, stocker and construction worker.  (Tr. 19, 82.)  Since March 29, 2001, Beiermann has not engaged in any substantial gainful employment.  (Tr. 19.)

### Beiermann's Testimony

At the hearing, Beiermann testified that he lives in Cedar Bluffs, Nebraska, is married and has two children then aged seven and four.  (Tr. 496-97.)  He described himself as a "jack of all trades" who works well with people.  He worked in construction and as a drywaller.  Beiermann testified that his hobby is working on cars, but he added that he can no longer do that very well.  Beiermann testified that the longest he held a job was for twenty-three months at Walmart as a salesperson, stocker and customer assistance clerk in the sporting goods, paint, hardware and electronics departments.  (Tr. 498.) Beiermann has basic computer skills.  Beiermann also testified that he once worked in a

2

school district for five months as a para-educator with special education children and then as a janitor when the school year ended to remain employed.  (Tr. 499.)  Beiermann left the janitorial position to earn more money at Oil Gear, a manufacturer of hydraulic pumps. He was with Oil Gear for nine months as a grade 1 burr bench operator when he was laid off.  As a grade 1 burr bench operator, Beiermann's duties were to prepare parts for the heat treat process and to clean the parts in preparation for assembly after they were hardened.  (Tr. 499-500.)  Beiermann testified that, while he was at Oil Gear, he started feeling ill and suffering from swollen legs.  (Tr. 500.)  Beiermann stated that his health problems began suddenly and within about six months he was "pretty much couch-ridden." (Tr. 501.)  Beiermann could not remember if he received unemployment compensation, but he stated that he looked for other employment to no avail.  (Tr. 501.)  Beiermann testified that he experienced some relief following an April 21, 2001, carpal tunnel release. Beiermann believes he has fibromyalgia, and he specifically mentioned pain in both hands. Beiermann is on medicaid.  (Tr. 502.)  He walks for exercise by walking a couple of laps around his house equaling about 100-150 yards.  (Tr. 503.)  Beiermann testified that he felt relief from depressants/anxiety medications such as Zoloft.  He stated that he was seeing both a psychiatrist and a psychologist shortly before the hearing, at Dr. Otten's "insistence."  (Tr. 504.)  When asked what was keeping him from working, Beiermann responded:

> I'm in severe pain all day, everyday.  I go to bed tired and in severe pain, and I wake up even tireder [sic], and in worse pain.  I've asked every doctor that I've been to what I can do to make it better, and I've done everything they've suggested and then some and nothing helps.

(Tr. 504.)

3

Beiermann stated that he did not return to his rheumatologist because the attempted treatments for his fibromyalgia made his symptoms worse.  Beiermann said that he still was having blackouts despite a normal EEG.  Beiermann wants an electric wheelchair, and his doctors will not prescribe one because they want him to walk.  Beiermann wants an electric wheelchair so that he can go to the park and zoo with his children, which he states he cannot do because of his limited ability to walk very far.  (Tr. 505.)

At home, Beiermann does laundry, picks up, watches the children, cooks and washes dishes.  About three or four times weekly he drives to Fremont, about sixteen miles round-trip.  (Tr. 506.)  Beiermann drives long distances only when necessary, but about one year before the hearing he drove  about three hours to Iowa, only stopping once.  (Tr. 517.)

Beiermann testified that his pain has increased during the two years preceding the hearing.  His pain is primarily located in his neck and shoulders, low back, right hip, knees and ankles.  When asked where he does not have pain, Beiermann responded that his elbows, left hip and upper middle back are without pain.  (Tr. 506.)

Beiermann's daily routine is to wake up, stretch and "limber up" in bed for about fifteen to twenty minutes, dress, take medicine, pick up around the house, watch television for a total of at least five or six hours daily and do laundry.  (Tr. 508-09.)  He cuts the grass with a riding mower, which takes about one hour.  (Tr. 510.)  Beiermann described his current hobby of gun smithing, which he does for himself and his friends.  (Tr. 506.)  Beiermann testified that his legs and ankles swell in particular during cold weather, and he takes hour-long hot baths for relief.  (Tr. 510-11.)  While Beiermann stated that he has been to physical therapy several times, including exercise and water therapy, he testified

4

that therapy only increased his pain.  Beiermann also testified that his pain medications do not provide significant relief.  He described his pain as a "10" at its intense point, reduced to an "8" or "9," and never below an "8."  (Tr. 511-12.)  Beiermann complained of lightedheadness and losing his balance, and he always uses a cane.  (Tr. 512-13.)  He uses crutches occasionally when the pain in his back and hip is severe.  (Tr. 513.)  Beiermann testified that he cannot use his hands due to pain.  (Tr. 514.)  He described hand tremors from nervousness or concentration.  (Tr. 515-16.)  Beiermann uses a computer for ten or fifteen minutes every couple of days, and he chats with his brother online for an hour or so.  Beiermann said that the computer use bothers his hands, but he deals with the pain by trying to keep his hands as straight as possible.  (Tr. 516.)  Beiermann testified that he can only sleep at night with medication, and that he usually sleeps well.  (Tr. 518.)  He complained that upon waking he feels tired and achy.  Beiermann generally wears a hearing aid.  (Tr. 519.)

***Vocational Expert's Testimony***

Testimony was also heard from a vocational expert ("VE"), Debra Determan, under contract with the Social Security Administration ("SSA").[1]  (Tr. 519-26.)  The ALJ's first hypothetical question posited a person of Beiermann's age and work experience, able to occasionally lift or carry 20 or more pounds and to frequently lift or carry 10 pounds, able to stand or walk for 2 hours in an 8 hour day and to sit for 6 hours in an 8 hour day with normal breaks.  The individual would be: unable to work on ladders, ropes and scaffolds; limited to wearing his hearing aids; and able to do

---

[1]Debra Determan's curriculum vitae is in the record.  (Tr. 54-56.)

5

occasional climbing, balancing, stooping, kneeling, crouching and crawling.  The VE testified that such an individual could not perform any of Beiermann's past relevant work, but could perform at least 80% of the sedentary work base.  (Tr. 520-21.) Examples of those jobs included cashier, laborer other than construction, assembler, freight material handler, and truck driver (Tr. 522).  If the hypothetical person could use his hands "frequently" but not "constantly," he could still perform the jobs of cashier and truck driver (Tr. 522).  Other examples of work that required no more than "frequent" use of hands were the jobs of interviewer, information clerk, messenger, and administrative support (Tr. 523).  The job of a cashier would be performed in a climate-controlled environment (Tr. 524-26).

### Documentary Evidence Before the ALJ

In addition to oral testimony, the ALJ considered medical evidence.  The record shows that on February 8, 2001, when Beiermann underwent a rheumatology consultation he was 5' 10" tall and weighed 258 pounds.  (Tr. 182.)  Beiermann's primary complaint was "weird swelling" and ankle and foot pain lasting one month. (Tr. 180.)   Beiermann also reported: musculoskeletal pain since childhood; intermittent, painful swelling in his elbows, back and wrists; and fatigue.  (Tr. 180.) The neurological examination and peripheral joints were normal.   Some mild puffiness was noted at each ankle; however, the ankles were nontender and moved fully without discomfort.  The impression appears to have been "very acute evidence of an inflammatory polyarthritis"  (Tr. 181.)

6

On February 13, 2001, Beiermann went to the emergency room at the Fremont Area Medical Center complaining of painful, swollen joints. (Tr. 231.) The diagnosis was viral syndrome and seronegative inflammatory arthritis, and heavy metal intoxication was ruled out. (Tr. 232.)

On March 20, 2001, Lisa M. Iseminger, a physician's assistant associated with Beiermann's primary care provider, Virgil V. Ottun, M.D., ordered a magnetic resonance imaging ("MRI") study of Beiermann's lumbar spine. The MRI showed no disc degeneration, evidence of focal disc herniation or spinal stenosis. (Tr. 229.)

On April 2, 2001, Beiermann was seen by Dr. Ottun with complaints of abdominal pain and nausea. An upper GI and ultrasound were normal. (Tr. 293.) Beiermann mentioned that he had recently been laid off and was told that he could not expect to return to work until sometime in July of 2001. (Tr. 293.) On April 10, 2001, R. F. Bergstrom, M.D., an orthopedic surgeon, performed a carpal tunnel release on Beiermann's right wrist. (Tr. 223.)

On April 18, 2001, Beiermann saw Kristin Bird, M.D., at the Nebraska Medical Center arthritis clinic. (Tr. 317-20.) Beiermann had multiple joint complaints, particularly in his lower extremities. (Tr. 317.) His musculoskeletal examination revealed no acute distress and an intact cervical range of motion. Beiermann did not have tenderness to palpation over any area of his spine or his shoulders, and he had good range of motion in his shoulders bilaterally. No evidence of synovitis existed in the elbows, wrists, MCPs (metacarpophalangeal joints), DIPs (distal

7

interphalangeal joint), PIPs (proximal interphalangeal joint), or hands.  Beiermann had good range of motion and no tenderness in these joints.  Beiermann had excellent range of motion in his hips with no tenderness in the area of the trochanteric bursa.  Normal flexion and extension were noted in the knees.  The ankles revealed no synovitis or warmth.  Dr. Bird's assessment was arthralgia and carpal tunnel syndrome, right upper extremity.  (Tr. 319.)  Dr. Bird noted that at present there was no evidence of any active ongoing inflammatory arthritis. Beiermann was given samples of Celebrex to see if that medication would be more effective than the Vioxx he had previously used.  (Tr. 320.)

On April 25, 2001, Dr. Bergstrom referred Beiermann to occupational therapy. (Tr. 222.)  On May 8, 2001, Dr. Ottun's office advised Beiermann that the lupus test was negative.  (Tr. 293.)  On May 9, 2001, Beiermann told Dr. Bergstrom that he had been laid off and was looking for work.  (Tr. 187.)

On May 25, 2001, Beiermann saw Dr. Bergstrom for a post-operative visit. Dr. Bergstrom found that Beiermann's wound was well healed, that his grip strength was 40 kg on the right and 59 kg on the left.  Beiermann reported some mild numbness and tingling in the small and ring fingers of his right hand.  Dr. Bergstrom again noted that Beiermann was looking for work and offered to provide him a release from treatment.  (Tr. 186.)

On June 1, 2001, when Beiermann was discharged from physical therapy for his right hand he reported significant improvement in pain.  The therapist described

Beiermann's progress as excellent, adding that all treatment goals were met. Continued home exercise was recommended.  (Tr. 206).

On June 20, 2001, Lynell Klassen, M.D., saw Beiermann at the rheumatology clinic of the Nebraska Medical Center.  (Tr. 315-16.) Beiermann reported that neither Vioxx nor Celebrex had helped him.   Dr. Klassen's impression was musculoskeletal pain syndrome.  She found no synovitis, deformities or limited range of motion in any joints.  (Tr. 315.)   She noted no evidence for an inflammatory disease process; however she recognized the possibility of a post viral syndrome and proposed treatment with prednisone.  (Tr. 316.)

On August 22, 2001, when Beiermann returned to the rheumatology clinic he complained of diffuse pain in the low back area, pain and stiffness in the right leg, and a sensation of being flushed with hot flashes throughout the day.  Beiermann gave himself a pain score of 8 out of 10.   (Tr. 309.)   The musculoskeletal examination was unremarkable.  (Tr. 310.)  Dr. Klassen's assessment was diffuse musculoskeletal pain syndrome, and no specific therapy was initiated.   (Tr. 311.)  Dr. Klassen noted:

> At the present time, I see no evidence of an underlying inflammatory process.  The patient has a totally positive review of systems which highly suggests an overlying psychiatric component. Laboratory studies are quite unremarkable and his physical examination is essentially normal.  Thus, I feel that there is probably not an inflammatory or autoimmune basis for his complaints.

(Tr. 311.)

On September 6, 2001, Beiermann went to the emergency room with complaints of lower back pain.  (Tr. 202-05.)  Later that same day, Beiermann went to Dr. Ottun's office. Dr. Ottun noted:  "Currently he's unemployed.  He states he cannot find a job and is

9

wondering about disability." (Tr. 291.)  Beiermann was given a lumbar support to help relieve his back pain. (Tr. 204, 292.)

On September 14, 2001, Beiermann returned to see Dr. Ottun, complaining of depression due to his medical situation and inquiring about antidepressant medication. (Tr. 289.)  Dr. Ottun gave Beiermann samples of Effexor.  (Tr. 289.)

On October 10, 2001, Beiermann was seen in the neurology clinic at the Nebraska Medical Center. (Tr. 303-06.)  His main complaints were diffuse aches and pains, including lower back pain. (Tr. 303.)  The assessment was lower back pain. (Tr. 303.)

On October 25, 2001, Edward Dale, Psy. D., a clinical psychologist, conducted a consultative psychological evaluation of Beiermann for the state agency. (Tr. 321-25.) Beiermann said that he found Effexor helpful for his depression. (Tr. 323.)  Dr. Dale's Axis I diagnosis was mild depression, secondary to illness, and his Axis III diagnosis was chronic pain.  He estimated that Beiermann's Global Assessment of Functioning ("GAF") as 40.[2]  (Tr. 324.)

---

[2]The GAF Scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders, at 34 (Amer. Psychiatric Ass'n, ed., 4th ed. 2000) ("DSM-IV").  A GAF of 31-40 suggests:

> Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

Id. (emphasis deleted).

10

On March 20, 2002,  Beiermann again saw Dr. Ottun.  The assessment was intermittent abdominal pain, nausea, depression, and reflux.  Dr. Ottun planned some diagnostic testing and recommended dietary modifications.  (Tr. 447).

On April 24, 2002, Beiermann saw Manjula Tella, M.D., a neurologist, on Dr. Ottun's referral.  (Tr. 410-11.)  Dr. Tella's impression was: normal nonfocal neurological exam; episodic right upper extremity paresthesias and tremors; previous normal MRI of the brain; and intermittent neck pain radiating intermittently to the right upper extremity.  (Tr. 410.) An MRI of the cervical spine was ordered, and Beiermann was started on Neurontin.  (Tr. 411.)  On May 16, 2002, Beiermann returned to Dr. Tella.  The MRI of the cervical spine was negative.  (Tr. 408.)  Dr. Tella also noted: "ongoing musculoskeletal pain with paresthesias involving the right side predominantly; fibromyalgia diagnosed in the past; and negative MRI of the brain and cervical spine.  (Tr. 408-09.)

On June 13, 2002, Beiermann again saw Dr. Tella with new complaints.  The diagnosis was: unilateral headache, vascular, migraines, induced by exertion with fatigue and dizziness; ongoing paresthesias, improved; and depression.  Beiermann's Zoloft was increased.  He was also continued on Neurontin and given Axert to use as needed for headache.  (Tr. 407.)

On July 22, 2002, Beiermann saw Dr. Ottun with complaints of ongoing back pain. (Tr. 442.)  Beiermann told Dr. Ottun that Dr. Tella had told Beiermann she thought he had fibromyalgia.  (Tr. 442.)  On July 24, 2002, Beiermann saw Dr. Tella with new complaints that included a lot of pain, especially in the back, and dizzy spells.  The pain seemed to be a result of Beiermann's work around the house, including moving an old couch out of the house and move a new one in.  Dr. Tella also noted that Beiermann was testing a power-

11

operated wheelchair for his back, yet he seemed to ambulate well.  The diagnosis was back pain and lumbar sprain.  (Tr. 406.)

On August 21, 2002, Beiermann returned to Dr. Tella.   Her diagnosis was musculoskeletal back pain; chronic pain syndrome; suspect underlying depression and possible symptom magnification.  Dr. Tella planned to order an MRI of Beiermann's lumbosacral spine.  (Tr. 405.)   On August 22, 2002, Dr. Ottun assessed right upper quadrant abdominal pain, nausea and constipation.  (Tr. 441.)  On August 23, 2002, the MRI's findings were minimal, and the diagnosis was minimal disc degeneration at L5-S1 and no evidence of disc extrusion or spinal stenosis.  (Tr. 404.)

On September 5, 2002, Beiermann presented to Dr. Tella.  Dr. Tella noted no improvement, and her impression was back and right hip pain. (Tr. 403.)  On September 19, 2002 , Beiermann complained to Dr. Ottun of increased soreness with joint swelling and requested increased pain medication.  Dr. Ottun continued him on Bextra.  On September 25, 2002, Beiermann telephoned in to say that Bextra and Tylenol had not helped his pain, so Dr. Ottun gave him Ultracet.  On September 26, 2002, Dr. Ottun assessed Beiermann with chronic back pain despite no demonstrable pathology. (Tr. 440.)

On October 3, 2002, Dr. Tella's impression was right occipital headaches, paresthesias, and atypical migraines.  (Tr. 402.)  On October 9, 2002, Dr. Ottun noted that Beiermann still complained of low back pain, unchanged.   On October 23, 2002, Beiermann complained to Dr. Ottun of sinus pressure and abdominal pain.  (Tr. 436.)  On October 25, 2002, Beiermann complained to Dr. Ottun of intermittent right-sided pain.  (Tr. 435.)  He did not complain of nausea or constipation.

12

On November 6, 2002, when Beiermann saw Dr. Tella he appeared frustrated by his discussion with Dr. Ottun about getting a wheelchair. Dr. Tella's impression was peripheral paresthesias, chronic fatigue, and depression. (Tr. 401.)

On November 26, 2002, upon seeing Dr. Tella Beiermann complained of having episodes where he had difficulty expressing himself, jumbled his words, blackout spells, hallucinations, and shakiness. She planned to order an electroencephalogram ("EEG") to rule out the possibility of epileptiform activity. (Tr. 400.) The EEG was normal. (Tr. 399.)

On December 12, 2002, Beiermann again saw Dr. Tella and reported no major problems since the last visit. Dr. Tella discontinued Gabitril. The diagnosis was depression, blackouts, and normal EEG. (Tr. 398.)

On December 21, 2002, Beiermann complained to Dr. Ottun of pain in right side of neck and shoulder secondary to a motor vehicle accident the previous night. (Tr. 432.) On January 9, 2003, Beiermann saw Dr. Tella. He mentioned the accident and complained of neck pain, right arm numbness and tingling. (Tr. 397.) On January 10, 2003, and again on January 24, 2003, Beiermann saw Dr. Ottun in follow up regarding his right shoulder pain. (Tr. 430-31.) Beiermann reported improvement in his pain and stated that he had not needed Ultracet but instead had found that Tylenol provided satisfactory relief. (Tr. 430.)

On February 6, 2003, Dr. Tella's impression was depression, headaches, back pain, and blackout spells in the past. (Tr. 396.) On February 7, 2003, Beiermann saw Dr. Ottun in a followup visit for his right shoulder pain. Beiermann reported that he was doing great and had no pain. (Tr. 430.)

13

On March 21, 2003, Beiermann complained to Dr. Ottun of increased body aches, pain and fatigue. Dr. Ottun noted that Beiermann appeared to ambulate well, had good strength in his upper and lower extremities, and had equal and adequate tendon reflexes. He advised Beiermann to increase his exercise. (Tr. 429.)

On April 9, 2003, Beiermann complained to Dr. Tella of pain and fatigue. The impression was chronic depression with ongoing neck, back, and diffuse musculoskeletal pain consistent with fibromyalgia. Dr. Tella recommended that Beiermann consider non-invasive pain management treatment options, specifically alpha stimulation. (Tr. 394.)

On May 12, 2003, Beiermann presented to Dr. Tella with complaints including fatigue. Beiermann had tried alpha stimulation pursuant to Dr. Tella's recommendation and found it helpful. Beiermann's medication might have caused his fatigue. Dr. Tella's diagnosis was chronic pain, depression and back and neck pain. (Tr. 393.)

On May 26, 2003, on Dr. Ottun's referral, Padma Lassi, M.D., a psychiatrist, conducted an outpatient initial psychiatric evaluation. (Tr. 388-90.) The purpose of the evaluation was to assess Beiermann's complaints of depression and anxiety. Beiermann's score on the Beck Depression Scale was consistent with mild mood disturbance. (Tr. 388.) Beiermann reported sexual, physical and verbal abuse from ages three to five. (Tr. 389.) It was also noted that Dr. Tella had diagnosed Beiermann with fibromyalgia. (Tr. 388.) Beiermann had already been turned down three times for SSI. Beiermann was given a diagnosis at Axis I of anxiety disorder, not otherwise specified. (Tr. 389.) Dr. Lassi recommended psychological testing, outpatient counseling and a medication evaluation with a psychiatrist. (Tr. 390.)

14

On June 9, 2003, Beiermann saw Dr. Ottun with complaints of nonspecific chest pain that he reported had somewhat improved. His weight had increased to 270 pounds. Beiermann mentioned his interest in applying for a motorized wheelchair or scooter to enable him to be more active. (Tr. 425.) Later the same day Beiermann also saw Dr. Tella. Beiermann requested a prescription for an electric wheelchair but Dr. Tella told him he did not meet the criteria based on his diagnosis, test results, etc. (Tr. 392.) She continued Beiermann on his current medications and approved his request for more frequent visits to the pain clinic, as those visits seemed to be beneficial. (Tr. 392.)

On June 12, 2003, Beiermann underwent another psychological evaluation by Dr. Dale, this time as part of a pretreatment evaluation for medicaid. (Tr. 475-76.) The diagnosis was major depression, moderate. Beiermann's GAF score for both the current and previous year was 60.[3] (Tr. 475.) Dr. Dale recommended further evaluation and treatment with respect to Beiermann's depression and, perhaps, chronic pain. (Tr. 476.) The record shows progress notes dated July 14, 2003, and August 13, 2003, which were submitted to the Appeals Council in support of the request for review (Tr. 479.)

### THE ALJ'S DECISION

The ALJ found that Beiermann was not "disabled" pursuant to his application for disability benefits under Disability or SSI benefits under Title XVI benefits. (Tr. 29.) The

---

[3]A GAF score of 60 indicates:

Moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

DSM-IV, at 34 (emphasis deleted).

15

ALJ framed the issues as: (1) whether Beiermann is entitled to disability and SSI benefits under the Act; and (2) whether Beiermann is "disabled" and, if so, the commencement and duration of the disability.  (Tr. 18.)

The ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920[4] to determine whether Beiermann is disabled, considering:

> any current work activity, the severity of any medically determinable impairment(s), and the individual's residual functional capacity with regard to his . . . ability to perform past relevant work or other work that exists in the regional and national economies.  This latter step requires an assessment of the individual's age, education and past work experience.

(Tr. 19.)

Following this analysis, the ALJ found that Beiermann is not disabled.  (Tr. 29.) Specifically, at step one the ALJ found that Beiermann has not performed any substantial gainful work activity since March 29, 2001.  (Tr. 19.)  At step two, the ALJ found that Beiermann has the following medically determinable impairments that are "severe" within the meaning of the SSA's regulations: diffuse myalgia (fibromyalgia); hearing loss; status post carpal tunnel release; knee arthritis; and asthma.  (Tr. 23.)  At step three, the ALJ found that Beiermann's medically determinable impairments, either singly or collectively, do not meet any section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." The ALJ noted that Beiermann did not contend that his impairments met the listings.  (Tr. 23.)  At step four, the ALJ determined that Beiermann is unable to perform his past relevant work as a school janitor, sporting goods salesperson, stocker, or construction worker.  At step five, the ALJ determined that the

---

[4]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits.

Commissioner has shown, through application of the medical vocational guidelines, that given Beiermann's age, education, work experience, and residual functional capacity, he possesses the residual functional capacity to engage in sedentary work that exists in the local economy with the following limitations: lifting and/or carrying twenty pounds occasionally and ten pounds frequently; sitting for six hours out of an eight-hour workday with normal breaks; standing or walking for two hours out of an eight-hour workday; no climbing, crouching, kneeling or crawling except on an occasional basis; and no working on ladders, ropes or scaffolds.  Additionally, Beiermann would need to wear a hearing aid, so he could encounter difficulties working in noisy backgrounds.  (Tr. 29-30.)   In reaching his decision, the ALJ weighed Beiermann's testimony, finding the testimony not credible insofar as Beiermann claimed that he was unable to do any type of work on a sustained basis and insofar as he claimed total disability.  (Tr. 27, 30.)  The ALJ reasoned that the record does not support Beiermann's testimony.  (Tr. 27.)  The ALJ also carefully considered the medical records and opinions submitted by numerous treating physicians (Tr. 19-23), physical therapists (Tr. 20), and a consultative psychologist.  (Tr. 21.)

### STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

17

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994).  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

18

SEQUENTIAL EVALUATION

In determining disability, the Act follows a sequential evaluation process.  *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work.  *Id.*  If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability.  *Id.*

In this case, the ALJ completed all five steps in the evaluation process, concluding: 1) Beiermann has not performed any substantial gainful work activity since March 29, 2001; 2) Beiermann has medically determinable impairments that are "severe" within the meaning of the SSA's regulations: diffuse myalgia (fibromyalgia); hearing loss; status post carpal tunnel release; knee arthritis; and asthma; 3) Beiermann's medically determinable impairments, either singly or collectively, do not meet the "listings"; 4) Beiermann is unable to perform his past relevant work as a school janitor, sporting goods salesperson, stocker, or construction worker; and 5) Beiermann possesses the residual functional capacity to engage in sedentary work that exists in the local economy, albeit with the limitations described above.

19

**PAIN ANALYSIS**

***Credibility of Beiermann's Testimony***

Beiermann argues that the ALJ did not properly consider his subjective complaints.

The ALJ found that the medical evidence does not support the severity of Beiermann's allegations of symptoms. Specifically, the ALJ noted: "Testing, such as MRI, EEG, x-rays and physical examinations has been basically normal. . . . [Beiermann] has seen a variety of specialists but none of them could find any objective evidence to support a diagnosis." (Tr. 26.) The ALJ described examinations performed by a rheumatologist and a neurologist that resulted in unremarkable findings. (Tr. 26.) The ALJ also noted physical therapy records indicating improvement. (Tr. 26.) The ALJ also described Beiermann's requests for a prescription for an electric wheelchair that were denied by his primary care physician and his neurologist. (Tr. 27.) As stated frequently by the ALJ, none of these findings is typical for an individual incapable of performing any substantial gainful work activity. (Tr. 26.)

The credibility of Beiermann's testimony in its entirety is crucial because, in determining the fourth and fifth factors relating to a claimant's residual functional capacity to perform past relevant work and a range of work activities in spite of his impairments, the ALJ must evaluate the credibility of a claimant's testimony regarding subjective pain complaints. The underlying issue is the severity of the pain. *Black v. Apfel,* 143 F.3d 383, 386-87 (8th Cir. 1998). The ALJ is allowed to determine the "authenticity of a claimant's subjective pain complaints." *Ramirez v. Barnhart,* 292 F.3d 576, 582 (8th Cir. 2002) (citing *Troupe v. Barnhart,* 32 Fed. Appx. 783, 784 (8th Cir. 2002); *Clark v. Shalala,* 28 F.3d 828,

20

830-31 (8th Cir. 1994)).   An "'ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.'"   *Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (stating the issue as whether the record as a whole reflected inconsistencies that discredited the Beiermann's complaints of pain) (quoting *Gray v. Apfel,* 192 F.3d 799, 803 (8th Cir.1999)).

Also, an ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate.   *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001).

The *Polaski* standard is the guide for credibility determinations:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.

> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

21

Interpreting the *Polaski* standard, §§ 404.1529 and 416.929 discuss the framework for determining the credibility of subjective complaints, e.g., pain.

An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints.  *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000).  This duty is fulfilled when an ALJ acknowledges the *Polaski* factors, and the ALJ has clearly examined the factors before discounting the claimant's testimony.  An ALJ is "not required to discuss methodically each *Polaski* consideration."  *Id.* at 972.

The federal regulations provide that the ALJ must consider all symptoms, "including pain, and the extent to which symptoms can reasonably be accepted as consistent with the objective medical evidence," defined as "medical signs and laboratory findings."  20 C.F.R. § 416.929.  Medical "signs" are defined as:

> anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 416.928(b).

> "Laboratory findings" are defined as: "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."

20 C.F.R. § 416.928©).

Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the

consistency between the statements and the other evidence in the record.  Ruling 96-7p

provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>
> * The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> * The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996). [5]

Deference is generally granted to an ALJ's determination regarding the credibility

of a claimant's testimony and, in particular, subjective complaints of pain.  *Dunahoo v.

Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason"

---

[5]Social Security Ruling 96-7p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

for discrediting claimant's credibility, deference is given to the ALJ's opinion, although each factor may not have been discussed).

In Beiermann's case, the record illustrates that the ALJ performed a thorough *Polaski* analysis in determining the credibility of Beiermann's subjective pain complaints. The ALJ considered: Beiermann's daily activities; the many medical opinions of Beiermann's treating physicians, including his primary care physician and several specialists; the report of a consultative physician; normal test and x-ray results; physical therapy records; and discrepancies between Beiermann's testimony and the evidence as well as between Beiermann's own statements.

In summary, the ALJ thoroughly engaged in the *Polaski* analysis and considered the appropriate factors. The ALJ set out the standards stated in §§ 404.1529 and 416.929, and the ALJ acknowledged the *Polaski* standard as well as applicable regulations and SSR 96-7p. The ALJ's conclusion that Beiermann's pain is not severe enough to prevent him from engaging in sedentary work with certain limitations is well-supported and based on a thorough analysis of treating and consultative medical reports.

Therefore, the ALJ appropriately determined that Beiermann's testimony is not credible with respect to the extent of his symptoms and limitations.

### Residual Functional Capacity

Residual functional capacity ("RFC") is defined as what Beiermann "can still do despite . . . limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). RFC is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends;

medical records; and the claimant's own description of his limitations. *Id.* §§ 404.1545(a)-©), 416.945(a)-©).

The ALJ must determine RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000). Before determining RFC, an ALJ first must evaluate the claimant's credibility. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any other evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *See Polaski,* 739 F.2d at 1322; *see also* § 404.1529. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Polaski,* 739 F.2d at 1322. The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall,* 274 F.3d at 1218.

In this case, the ALJ set out the language describing the appropriate standard under *Polaski* and § 404.1529. (Tr. 23-25.) The ALJ summarized Beiermann's testimony and described his daily activities according to the testimony and documentary evidence. (Tr. 25-26.) The ALJ specifically considered, in addition to Beiermann's testimony, documentary evidence including reports of treating and consultative physicians, an RFC assessment, and the testimony of Deborah Determan, a vocational expert under contract with the SSA. The VE opined that Beiermann has the RFC to perform sedentary jobs existing in significant numbers in the local economy.

25

***Question Posed to Vocational Expert***

A vocational expert's hypothetical questions are proper if they sufficiently set out all of the impairments accepted by the ALJ as true, and if the questions likewise exclude impairments that the ALJ has reasonably discredited. *Pearsall,* 274 F.3d at 1220.

Examining the hypothetical posed to the VE in this case, the question properly included the impairments that the ALJ found to be substantially supported by the record as a whole. The question appropriately did not include Beiermann's subjective complaints regarding his hands, depression, fatigue, and pain (particularly in the neck), as the ALJ found these complaints not credible.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 29th day of September, 2005.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge